**Thaddeus Betz**, OSB No. 062745
Oregon Justice Resource Center
PO Box 5248
Portland OR 97208
(971)205-6650
tbetz@ojrc.info
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **A.H., E.E.,** | USDC Case No. 6:25-CV-00972 |
| Plaintiffs, | |
| v. | CLASS ACTION ALLEGATION FIRST AMENDED COMPLAINT |
| **MICHAEL TESSEAN, JANA MCLELLAN, JOSEPH O'LEARY, DAN BERGER, ARDELL BAILEY, ANTONIO VARGAS, MARCUS BIGELOW, LIZZETTE MURO, THERON SEGAR, DIVINE JACOBO, IVAN LAIB, TROY BRITTING, J. DOES (1-5),** | Violation of Civil Rights<br>(42 U.S.C. § 1983) |
| Defendants. | Jury Trial Demanded |

Plaintiffs, A.H., and E.E., by and through their attorney, hereby alleges:

**INTRODUCTION**

Plaintiffs bring this action to remedy serious violations of their constitutional rights. As adjudicated children, Plaintiffs were placed into the custody and care of the Oregon Youth

Authority. While so confined, on numerous occasions, A.H. and E.E. were strip-searched and placed, alone, into a locked room for lengthy periods of time—at times extending for weeks. No hearing was afforded to the Plaintiffs when this punitive action occurred. During this solitary confinement, Plaintiffs were often not permitted out of this room for 23 hours per day. Worse, Plaintiffs were never informed the duration of this restriction—it could be days, weeks, or months. Were that not punishment enough, Plaintiffs were deprived of education, treatment, family contact, and social activities during this time. This all occurred despite the Oregon Youth Authority knowing that isolation practices harm juveniles and the good order of youth correctional institutions. The Defendants' conduct injured the Plaintiffs, harmed the institution, and violated the Constitution. For this, the Plaintiffs and the classes they represent are entitled to injunctive relief, damages, and attorney's fees.

## NATURE OF ACTION

1.

Oregon law prohibits the Oregon Youth Authority ("OYA") from punishing youth with isolation (the equivalent of solitary confinement) in response to the youth's behavior. The recently fired Director of OYA, Joe O'Leary, who is a Defendant in this suit, in fact advocated for this ban of isolation: in both 2015 and 2017, he testified before the Oregon Legislature that "…we know isolation is bad for developing brains[.]" Defendant O'Leary testified to the legislature that the definition of isolation is "pretty straightforward. Key elements are: alone; locked room; and due to the youth's behavior or conduct." Following that testimony, the Oregon Legislature amended Or. Rev. Stat. § 420A.108(1)(b)(C) to provide that sanctions and punishments for violation of rules regulating the conduct of youth in the custody of OYA "[m]ay not include placing an adjudicated youth or other person * * * alone in a locked room." In rare

instances where isolation is used in response to present or imminent violence, it is only to be used until the youth is re-regulated and, in any event, not to exceed five consecutive days absent satisfying strict safeguards.

2.

Defendants, including Defendant O'Leary, have repeatedly placed Plaintiffs, who were adjudicated youth currently in the custody of OYA, in isolation "alone in a locked room" as a sanction and punishment for alleged violations of OYA rules. In one such instance, as described below, Plaintiff A.H. was unceremoniously punished with Isolation for 32 consecutive days as part of, and disguised as, a therapeutic intervention program in name only. Similarly, Plaintiff E.E. was punished for failing to follow orders with isolation for 24 consecutive days, also disguised as a therapeutic program. Defendants' ambiguous labels like "intervention" and "program" are merely deceptive wordplay employed to evade compliance with state law. Placing an adjudicated youth or another person "alone in a locked room" in response to an alleged rule violation is, to any rational individual, a sanction or punishment.

3.

This same conduct by Defendants, placing youth in their custody into locked isolation rooms as punishment for the youths' behavior, has occurred to more than dozens of youth. In fact, it is the practice of OYA to use isolation in this manner.

4.

OYA Defendants are well-aware that using isolation is an especially harmful and injurious practice on juveniles. State statute, administrative regulations, and agency policy bar its use for purposes of discipline, require that it be sparingly used, require that it be temporally limited, and mandate it not interfere with rehabilitative efforts. Yet, OYA ignores these mandates and requirements with callous disregard. Instead, isolation is used as punishment without due

process of law and in conditions that are deliberately indifferent to the well-being of youth at MacLaren.

5.

Plaintiffs bring this suit under 42 U.S.C. § 1983 because Defendants have and are violating their substantive and procedural rights under the Due Process Clause of the Fourteenth Amendment. Plaintiffs seek declaratory relief, nominal, compensatory and punitive damages and reasonable costs and attorney's fees, pursuant to 42 U.S.C. §1988.

## JURISDICTION AND VENUE

6.

This Court has jurisdiction over Plaintiffs' claims of violation of federal constitutional rights under 28 U.S.C. §§ 1331 and 1343. This court has supplemental jurisdiction over Plaintiffs' pendent state law claims under 28 U.S.C. § 1367.

7.

Venue is proper under 28 U.S.C. § 1391(b), in that one or more of the Defendants reside in the District of Oregon and Plaintiffs' claims for relief arose in this district.

## PARTIES

8.

A.H. is and, at all times relevant, was a resident of the State of Oregon. He was a minor child at the time of the constitutional violations and is proceeding under his initials.

9.

E.E. is and, at all times relevant, a resident of the State of Oregon. He was a minor child at the time of the constitutional violations and is proceeding under his initials.

10.

Michael Tessean is currently the Director of the OYA, acting under color of state law. He is sued in his official capacity.

11.

At all times relevant, Jana McLellan was employed by OYA, acting under color of state law. Between on or about March 13, 2025 and on or about August 17, 2025, Defendant McLellan was employed as Interim Director of the OYA. At all other times relevant, Defendant McLellan was employed as the Facility Services Assistant Director of the OYA. All of the conduct alleged below occurred within the scope of her employment with the OYA. She is sued in her individual capacity.

12.

At all times relevant, Joseph O'Leary was employed as the Director of the OYA, acting under color of state law. All of the conduct alleged below occurred within the scope of his employment with the OYA. He is sued in his individual capacity.

13.

At all times relevant, Dan Berger was employed as the Superintendent of MacLaren, acting under color of state law. All of the conduct alleged below occurred within the scope of his employment with the OYA. He is sued in his individual capacity.

14.

Troy Britting is employed as the Superintendent of MacLaren, acting under color of state law. All of the conduct alleged below occurred within the scope of his employment with the OYA. He is sued in his individual and official capacity.

15.

At all times relevant, Ardell Bailey was employed as a Program Director of MacLaren, acting under color of state law. All of the conduct alleged below occurred within the scope of his employment with the OYA. He is sued in his individual capacity.

16.

At all times relevant, Antonio Vargas was employed as a Living Unit Manager of MacLaren, acting under color of state law. All of the conduct alleged below occurred within the scope of his employment with the OYA. He is sued in his individual capacity.

17.

At all times relevant, Divine Jacobo was employed as a Living Unit Manager of MacLaren, acting under color of state law. All of the conduct alleged below occurred within the scope of his employment with the OYA. He is sued in his individual capacity.

18.

At all times relevant, Marcus Bigelow was employed as a Living Unit Manager of MacLaren, acting under color of state law. All of the conduct alleged below occurred within the scope of his employment with the OYA. He is sued in his individual capacity.

19.

At all times relevant, Lizzette Muro was employed as a Youth Corrections Unit Coordinator of MacLaren, acting under color of state law. All of the conduct alleged below occurred within the scope of her employment with the OYA. She is sued in her individual capacity.

20.

At all times relevant, Theron Segar was employed as a Youth Corrections Unit Coordinator of MacLaren, acting under color of state law. All of the conduct alleged below

occurred within the scope of his employment with the OYA. He is sued in his individual capacity.

21.

At all times relevant, Ivan Laib was employed as a Group Life Coordinator of MacLaren, acting under color of state law. All of the conduct alleged below occurred within the scope of his employment with the OYA. He is sued in his individual capacity.

22.

Defendant J. Doe(s) (1-5) are employed as staff at MacLaren, acting under color of state law. Their names are currently unknown but will be identified through discovery. All of the conduct alleged below occurred within the scope of his or her employment with the OYA. Doe(s) Defendants are sued in his or her individual capacities.

## FACTUAL ALLEGATIONS

### OYA's Duty of Care Over Children Placed into its Custody

23.

In 2023, a State of Oregon juvenile court adjudicated Plaintiff A.H. as being within the delinquency jurisdiction of the juvenile court for conduct that, if committed by an adult, would constitute a crime when he was 15-years-old.

24.

In 2023, a State of Oregon juvenile court adjudicated Plaintiff E.E. as being within the delinquency jurisdiction of the juvenile court for conduct that, if committed by an adult, would constitute a crime when he was 15-years-old.

25.

Juvenile delinquency courts are not intended to be punitive and a delinquency adjudication is not a criminal conviction. The purposes of Oregon's delinquency system are

enshrined in Or. Rev. Stat. § 419C.001 which provides that "[t]he system is founded on principles of personal responsibility, accountability, and reformation…[t]he system shall provide a continuum of services that emphasize prevention of further criminal activity by the use of early and certain sanctions, reformation, and rehabilitation programs…"

26.

Following A.H.'s adjudication, the juvenile court entered a dispositional order. That order committed A.H. into the legal and physical custody of the OYA for purposes of his rehabilitation and also granted guardianship of A.H. to OYA. The duration of A.H.'s commitment is indefinite but not to exceed his 25th birthday on December 1, 2031.

27.

On or about September 14, 2023, the OYA placed A.H. at the MacLaren Youth Correctional Facility in Woodburn, Oregon ("MacLaren"). A.H. was released on parole from MacLaren on or about May 28, 2025. On or about December 31, 2025, A.H.'s parole from MacLaren was revoked and he was returned to that institution where he remains. A.H. may continue to be paroled and returned to OYA custody until his 25th birthday.

28.

Following E.E.'s adjudication, the juvenile court entered a dispositional order. That order committed E.E. into the legal and physical custody of the OYA for purposes of his rehabilitation and also granted guardianship of A.H. to OYA. The duration of E.E.'s commitment is indefinite but not to exceed February 10, 2032.

29.

On or about February 10, 2023, OYA placed E.E. at MacLaren. E.E. remains incarcerated at MacLaren.

30.

Under Oregon state law, when a juvenile court commits a youth to the custody of the OYA, the court must find that it is in a youth's best interest, for rehabilitation, and not intended to be punitive. *Matter of TJL*, 335 Or App 477, 485 (2024).

31.

Under Oregon state law, as outlined in Or. Rev. Stat. § 419C.550, the OYA has a duty to provide care, basic necessities, education, medical treatment, and other parent or guardian-like responsibilities.

32.

A duty of care creates other affirmative obligations and failure to provide them can be punished criminally. Or. Rev. Stat. § 163.200 provides for criminal penalties on those who have a duty of care over another person and negligently fail to provide adequate food, physical care, or medical attention. Or. Rev. Stat. § 163.205 imposes criminal penalties on those who have a legal duty to provide care for another person and knowingly or intentionally withhold physical care or leave the dependent person unattended at place for such a period of time as may be likely to endanger the health or welfare of that person.

**Housing Conditions and Isolation in MacLaren**

33.

MacLaren is comprised of several individual locked housing units that are separate structures from one-another within the grounds of the institution. Each housing unit varies as to how many children reside in each one but typically contain between twelve to twenty youth. At times relevant, A.H. was regularly housed in the Dunes unit and E.E. as regularly housed in the Boulder, Dunes, Crater and Fossil units of MacLaren. Boulder, Fossil, Crater and Dunes are standard "valley" housing units. Standard housing units are open-dorm style where all youth

sleep in one large room. It is designed to be consistent with best practices in positive youth development. The unit has a recreational dayroom which is commonly referred to as "core", a fenced outdoor patio with recreational and exercise equipment, a kitchen, a staff office, a room where those youth with extra privileges can access, and a restroom available to all youth in custody that is commonly referred to as "the flats."

34.

While Plaintiffs were housed at standard "valley" housing units, Plaintiffs attended school, received treatment, socialized with peers, had access to the fenced recreational area, had access to the larger recreational yard, had access to a phone to speak with their families or other authorized contacts, and had access to a private property locker where they could use and store personal property and non-contraband items.

35.

In addition to standard housing units, MacLaren also has "courtyard" units that are used for specialized purposes such as intake, parole revocation, mental health services and other special purposes.

36.

The Intervention Unit ("IU") is a segregated and separate building within the grounds of MacLaren. On or about March of 2025, the IU was relocated to a different building in the "courtyard" area. At all relevant times for this complaint, Plaintiffs' placements in IU took place in its prior, older building.

37.

The previous IU consisted of the following conditions and practices:

- The structure was designed for isolation and solitary confinement like conditions. It is

comprised of single occupancy cells and a dayroom "core" area that may be utilized by youth at the discretion of IU staff. The cells have metal locking doors. There is no bed, no table, and no chair. Instead, there is only a mattress on the floor. The isolation room contains a toilet, but no ability to flush it. Instead, youth must ask staff, when they are available, to flush the toilet, or provide water.

- Youth placed there were unable to communicate with one-another or with any other person except as they were checked up on by staff. They were each placed into their own individual isolation cells. They were not permitted to have pens, pencils, or paper. They may have been provided one to two books. No other property was permitted. The cells otherwise have no form of recreation, education, or intellectual stimulus.
- Upon detention in IU, youth initially remain in their locked isolation cells for at least 23 hours per day. This 23-hour-per day isolation typically lasts for three days but can last much longer. Staffing levels often dictated whether youth were released from their individual isolation cells and for how long.
- The only opportunity a youth would have to receive treatment, recreation, shower, or general free time would be during their period out of their isolation cell.
- A youth in IU is generally permitted one 15-20 minute phone call per week if they are on a Safety Program and at the discretion of IU staff.
- There are no regularly scheduled visitation periods for youth in IU.
- A youth in isolation does not attend school or their regularly scheduled treatment and rehabilitation programming.
- IU was generally unsanitary.

- The rooms were stained with what appeared to be old food and human bodily fluids. The plumbing system was inadequate such that the rooms smelled of sewage. Youth placed in the IU were frequently not provided an opportunity to clean the room at the time of placement and cleaning supplies are not routinely provided to youth during the duration of placement in IU. Youth are not able to flush the toilets of the IU cells; instead, staff must be available in order to flush them. Youth were not provided a mattress for several hours and simply had to sit on a filthy floor.
- Meals were served to the isolation rooms. The meals are portion-controlled and there is no opportunity for additional helpings as there are on the standard living units. There was no table or chair.
- When a youth housed at MacLaren is placed in IU, they are removed from their housing unit, forcibly if necessary. Either routinely or uniformly, regardless of the reason for their placement, or how quickly that placement occurs with respect to the event that gave rise to their placement in that IU, they are strip-searched, again, by force if needed.

38.

Solitary confinement is commonly defined as isolative custody in a locked confined cell or living space for the vast majority of waking hours without meaningful activity, movement, or social interaction.

39.

At all times relevant to this complaint, the prior MacLaren IU was solitary confinement, in which an adjudicated youth or other person is placed alone in a locked room as a sanction or punishment for violating OYA rules.

40.

MacLaren's IU was relocated in March of 2025 to the Rockaway housing unit. Rockaway is comprised of locked individual cells without a toilet or a sink. An OYA staff person must release youth from the cell in order to use the bathroom. Rockway does have a common day room area as well as an outdoor recreation fenced patio that are only accessible when a youth is released from their individual room.

41.

On information and belief, the operation of Rockaway as isolation is substantially similar to the operation of the prior IU in which an adjudicated youth or other person is placed alone in a locked room as a sanction or punishment for violating OYA rules.

42.

The use of isolation, loss of privileges, and the limitations of recreational activities, commissary items, and freedom of movement within the facility is viewed as a form of punishment for committed youth, including Plaintiffs, when it is directly related to alleged misconduct committed by the person in custody within the facility.

43.

A youth's placement in IU imposes an atypical and significant hardship on youth. When in isolation, youth are denied access to necessities, opportunities, and privileges readily available to the general population at MacLaren, including but not limited to, education, regular exercise, regular sanitation, access to peers, and all personal possessions such as pens and paper and communication with family and friends.

**Solitary Confinement and Isolation Cause Serious Harm and Injury to Juveniles**

44.

Isolation or solitary confinement is well known to cause harm. This is particularly true in children. Solitary confinement is profoundly damaging to children who are still developing physically, psychologically, cognitively, socially, and emotionally.

45.

Isolation confinement exacerbates mental health disorders in children. It can also cause them when a youth does not already suffer from one. These conditions include, but are not limited to, post-traumatic stress disorders, psychosis, anxiety disorders, adjustment disorders and depression. Symptoms that isolation can cause or exacerbate include, but are not limited to, hyper-vigilance, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, emotion dysregulation, anger, violent outbursts and suicidal behavior.

46.

The harm from isolation can be long term and lead to chronic mental health conditions such as depression. In addition, youth who experience depression and anxiety in their teen years are at higher risk of presenting with these disorders as adults.

47.

Not only is it harmful to deprive a youth of meaningful social interaction or mental stimulation, it also is counterproductive to the goals of ensuring safety, security, and good order. Research shows that segregating youth results in increased agitation and an increased risk of misbehavior. Facilities that have reduced their reliance on disciplinary isolation and instead have adopted more appropriate techniques for managing juveniles have seen reductions in rates of violence and misbehavior.

48.

The well-known harms of solitary confinement on children led to a number of professional organizations to call for an end to the practice.

49.

The National Commission on Correctional Health Care ("NCCHC") issued a position statement in 2016, issued a statement on the use of solitary confinement and concluded "juveniles…should be excluded from solitary confinement of any duration."

50.

The Juvenile Detention Alternatives Initiative ("JDAI"), which has developed the most widely recognized set of national best practices on the use of solitary confinement with juvenile populations, provides that solitary confinement can never be used for purposes of punishment or discipline and must be limited to periods of less than four hours.

51.

The American Medical Association ("AMA") and the American Academy of Child and Adolescent Psychiatry have also called for an end to the use solitary confinement for juveniles because of resulting adverse health outcomes.

52.

Having recognized in a 2012 report that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement," the United States Department of Justice ("USDOJ") subsequently recommended that the use of solitary confinement for juveniles in federal prisons be prohibited, and President Obama adopted that recommendation in January 2016.

53.

In 2018, the American Psychiatric Association ("APA") adopted a Position Statement on Solitary Confinement (Restricted Housing) of Juveniles. It recites that "juveniles are at particular risk of potential psychiatric consequences" and that such a practice should be avoided and never used for punitive purposes.

54.

Congress banned the use of isolation on children in federal facilities in 2018. The First Step Act prohibits the use of isolation on children in federal facilities "for discipline, punishment, retaliation, or any reason other than as a temporary response to a covered juvenile's behavior [that] poses a serious and immediate risk of physical harm to any individual, including the covered juvenile." 18 U.S.C. § 5043(b)(1).

**Defendants' Knowledge of the Harmful Effects of Isolation for Juveniles**

55.

Defendants are well aware of the harmful effects of solitary confinement or isolation on children.

56.

On September 30, 2015, the OYA presented information at a legislative informational hearing concerning the harm that the use of isolation causes on juvenile populations and that prevailing youth correctional standards emphasized the importance to reduce its use. At that hearing, Defendant O'Leary testified that isolation among youths is known to be harmful to children's development.

57.

In 2017, the Oregon Legislature passed Senate Bill (SB) 82, amending Or. Rev. Stat. §

420A.108. This amended statute bars the use of isolation for purposes of sanctions and punishment.

58.

This legislation was drafted at the request of, and supported by, OYA. Defendant O'Leary and OYA employee Erin Fuimaono testified before both the House and Senate Judiciary Committees in support of SB 82.

59.

On April 25, 2017, Defendant O'Leary testified before the Oregon Legislature House Committee on Judiciary in support of SB 82, stating that "we know that isolation is bad for developing brains[.]"

60.

Both Defendant O'Leary and Fuimaono expressed that the legislation proposed in SB 82 mirrored existing practice in OYA policy and Defendant O'Leary testified that the legislation was necessary to solidify existing OYA policy into enforceable state statutory law: "Knowing that [banning] isolation is already part of the policy, there's a risk there if we weren't to follow that policy. But if it's also a statute, that just seems to increase the risk if we don't follow it."

61.

Defendant O'Leary provided further testimony that OYA was mindful of the harm that isolation causes and attempted to develop policies and practices that would avoid that known harm. On April 25, 2017, Defendant O'Leary testified to the Oregon Legislature House Committee on Judiciary that isolation rooms are "individual rooms that are clean, that have windows, and we have policies that require a certain amount of time for recreation, for schooling, and other activities, programming activities. Our units that are used as isolation rooms also have adjacent day rooms where staff can place youth. So they're not in a room 24/7. That is

absolutely not the practice. So even in those extreme cases where there is violence, our intent is to really keep those protections in place. We don't want to put in any circumstance a system in place where there is some kind of 24/7 segregation."

62.

On April 25, 2017, Fuimaono testified to the Oregon Legislature House Committee on Judiciary that OYA had developed polices to limit isolation to instances where violence is imminent or where violence has occurred, had developed skill building and reintegration processes focused on reintegrating youth out of isolation and back to their living unit communities, and had employed a reintegration skill development coordinator to facilitate reduction of a youth's length of stay in isolation.

63.

Defendant O'Leary personally approved the OYA Part II-B-1.2 policy in 2023 regarding isolation and other interventions. That policy recites:

> Lengthy use of isolation has been linked to adverse psychological reaction, which may exacerbate histories of trauma, cultural trauma (whether personal, historical, or generational), mental health concerns, developmental disability or other cognitive delays.

64.

Defendant O'Leary and OYA instituted training to all Defendants about the harmful effects of isolation on youth in custody.

**Statutory and Regulatory Restrictions on the Use of Isolation**

65.

State statute, Oregon Administrative Regulation, and OYA Policy all substantially restrict the use of isolation.

66.

**“S**anctions or punishments for violation of rules regulating the conduct of adjudicated youths and other persons in the custody of the youth authority: (A) Must be structured to reflect the severity and frequency of the violations; (B) Must be consistently and promptly imposed; and (C) May not include placing a youth or other person in the custody of the youth authority alone in a locked room.” Or. Rev. Stat. § 420A.108(1)(b).

67.

OYA has implemented Or. Rev. Stat. § 420A.108 in Oregon Administrative Rules 416-490 and OYA polices including Part II-B-1.2- “Use of Time Out, Room-lock Other, Isolation, and Safety Programs in OYA facilities.”

68.

OYA regulations provide various “Interventions” that may be used by OYA staff to address youth misbehavior. An Intervention is defined as “[t]he means by which a YIC's negative behavior is redirected to a more acceptable level. Staff Interventions are designed to alter the environment to allow the individual YIC to gain self-control and develop skills to change the YIC’s negative behavior. The type of Intervention used must directly correlate to the behavior change needed.” Or Admin. Rules 416-490-0010(2).

69.

“Once initiated, the Intervention must be as limited in time as possible.” Or Admin. Rules 416-490-0021(5).

***Isolation***

70.

OYA defines “Isolation” as one type of Intervention: “A crisis Intervention where a YIC is temporarily placed alone in a room with a locked door due to the YIC’s crisis behavior.” Or

Admin. Rules 419-490-0010(3).

71.

This definition is consistent with Defendant O'Leary's definition of isolation. In a September 30, 2015 informational hearing before an interim legislative committee, Defendant O'Leary explained that "[t]he definition of isolation under Oregon administrative rules and under OYA policy is pretty straightforward. Key elements are: alone; locked room; and due to the youth's behavior or conduct."

72.

OYA regulations state that "Isolation may only be used when a YIC presents a danger to self or others, including to prevent substantial physical plant damage or serious compromise to facility operations, and to prevent an escape from a youth correctional facility." Or Admin. Rules 419-490-0021(2). Isolation "is viewed as an exceptional or extreme practice" Or Admin. Rules 419-490-0021(4), "an emergency safety Intervention, [and] not a therapeutic technique." Or Admin. Rules 416-490-0021(14).

73.

The use of isolation is limited to "when the YIC is in danger of physically harming others, where a serious threat of violence is present, or violence has occurred." Or Admin. Rules 416-490-0032(1)(b). Policy II-B-1.2 requires staff to consider "less restrictive interventions" and, prior to a youth being placed in isolation, a "staff member not involved in the incident must try to help the youth with emotional regulation and problem-solving prior to using an isolation intervention."

74.

On September 30, 2015, Defendant O'Leary provided testimony before an Oregon legislative committee in an informational hearing regarding OYA policy and practice of

isolation: “So very quickly, the highlights of the administrative rule and policy are as follows: The grounds for an isolation placement are limited to danger to self, danger to others, or immediate threat to safety or order of the facility. The administrative rule clarifies that isolation is not to be used for punishment. There's a cap on isolation under the administrative rule. It cannot extend more than five days consecutively. And it also says that the placement must be, under the rule, the minimum amount of time needed to obtain the re-regulation of the youth.”

75.

When used, isolation is to be “implemented in a manner designed to protect the youth’s safety, dignity, and emotional wellbeing.” Or. Admin. Rules 416-490-0021(14).

76.

When a youth is placed in an isolation cell, IU staff are required to monitor the youth in 15-minute intervals for well-being and possible return to the general population. Or. Admin. Rules 416-490-0032(3).

77.

“Isolation must only be used until the YIC regains self-control and can return to a less restrictive setting.” Or. Admin. Rules 416-490-0032(4).

78.

Isolation placement must be approved by an OYA manager.

79.

Under OYA Policy II-B-1.2, even while in IU, “[O]nce it has determined that a youth is emotionally regulated and ready to engage in reintegration planning, the youth must spend as much time out of the isolation room as possible during waking hours.”

80.

“An Isolation incident must not exceed five consecutive days.” Or. Admin. Rules 416-

490-0032(4)(a).

81.

"Only the OYA director or Facility Services director may approve an incident of Isolation exceeding five consecutive days, and must review the incident daily for its possible conclusion." Or. Admin. Rules 416-490-0032(4)(b).

### *Safety Program*

82.

OYA defines a "Safety Program" as another type of Intervention: "An intensive, YIC-specific, time-limited Intervention that modifies a YIC's activities to focus on developing the YIC's emotion regulation and problem-solving skills." Or. Admin. Rules 416-490-0010(7).

83.

A Safety Program plan must identify: (1) what routine activities are being controlled; (2) the modified activities in which the youth will engage; and (3) and when, where and how the youth will engage in those modified activities. Or. Admin. Rules 416-490-0033(2).

84.

"A YIC may only remain in a Safety Program until the YIC is able to self-manage behavior and safely interact within the routine activities of the living unit community, as determined by the YIC's treatment team." Or. Admin. Rules 416-490-0033(a).

85.

Interventions, including Safety Programs and Isolation, "must not be initiated or maintained as a substitute for treatment, as punishment, or for staff convenience." Or. Admin. Rules 416-490-0021(13); Or. Admin. Rules 416-490-0032(2) (same).

86.

"A Safety Program Intervention may use a combination of Room-lock Other and

Isolation incidents to modify routine activities such as meals, recreation, school, treatment or other programs. Or. Admin. Rules 416-490-0033(1).

87.

"All incidents of Room-lock Other and Isolation must follow [Or. Admin. Rules] 416-490-0025 and 416-490-003" when used in conjunction with a Safety Program. Or. Admin. Rules 416-490-0033(1). OYA Policy II-B-1.2 is clear that "[a]ny use of a isolation as part of a youth's safety program must follow OYA isolation policy standards."

***Administrative and Management Reviews***

88.

Administrative and management reviews are also required by OYA Policy II-B-1.2. First, a manager "not involved" in the decision to place a youth into isolation must review that determination and ensure it is consistent with policy. Second, a manager or operations director must assess, twice daily during waking hours, a youth's reintegration plan. This assessment must be documented in the reintegration plan. Third, if a youth is not returned to their living unit within three days, the superintendent must review and approve any continued use of isolation. This review must be documented. Fourth, if a youth is not returned to the youth's living unit within 5 days, the facility services assistant director must review and approve any continued isolation. This review and approval of continued isolation must be written and contain supporting rationale. The facility services assistant director must review the youth's isolation daily thereafter for possible conclusion.

89.

OYA Policy II-B.1.2 prohibits any search beyond a "frisk search," such as a strip-search, unless there is "probable cause to believe that such search will lead to the discovery of

contraband that may be used to harm the youth or others or is a threat to the safety and security of the facility." In addition, such a search must be approved by a manager.

90.

Defendant O'Leary provided trainings and education to all defendants about the legal, regulatory, and policy restrictions on the use of isolation.

91.

Defendants are aware that the IU has not been used consistently with Or. Rev. Stat. § 420A.108 and OYA polices and regulations implementing that statute. Defendants are aware that the IU has been used for purposes of punishment and used in situations where the youth is not presenting as a danger to self or others.

**OYA Behavior Management and Sanctions**

92.

Whereas isolation, by state law, is not permitted to be used as a sanction for misconduct, OYA does use other sanctions which may be used together with isolation.

93.

"OYA has a YIC behavior management system to promote YIC behavior. The behavior management system must provide incentives and reinforcement for responsible behavior and consistent Refocus Options for negative behavior." Or. Admin. Rules 416-470-0000(2).

94.

A Refocus Option is defined as "An authorized response to, or sanction imposed for, a YIC's inappropriate behavior." Or Admin. Rules 416-470-0010(3). Behavior violations are defined as either a Major Behavior Violation or a Minor Behavior Violation. A Refocus Option is, then, a sanction for institutional misconduct.

95.

A youth who aids another youth in a behavior violation is considered to having engaged in the same behavior for purposes of the Behavior Management System Refocus Options. Or. Admin. Rules 416-470-0020(2).

96.

OYA has established a Youth in Custody Behavior Refocus Option Matrix that defines prohibited youth behaviors and corresponding Refocus Options. Or. Admin. Rules 416-470-0020(1). Potential Refocus Option sanctions that may be imposed for Major Behavior Violations include: referral for transfer to adult corrections for youth who are in the legal custody of adult corrections; a Safety Program referral; or loss of privilege or program level.

97.

A Major Behavior Violation is defined as "YIC behavior that is prohibited and unacceptable within the facility or program and is immediately threatening to life, health, or facility safety, security or good order." Or Admin. Rules 416-470-0010(1). "Levels Zero, One, and Two YIC Prohibited Behaviors listed on the Youth in Custody Behavior Refocus Option Matrix are major behavior violations." Or Admin. Rules 416-470-0020(1)(a). A Level Zero violation is the most serious violation.

98.

A Minor Behavior Violation is defined as "YIC behavior that is prohibited and unacceptable within the facility or program but is not immediately threatening to life, health, or facility safety, security or good order." Or Admin. Rules 416-470-0010(2).

99.

A staff assault is defined as "Any instance in which a youth in custody instigates a physical conflict with a staff member." A youth Assault is defined as "Any instance in which a

youth in custody intentionally instigates a physical conflict with another youth in custody." An assault that results in serious injury is defined as a Level Zero violation and an assault that does not result in serious injury is a Level One violation. Or. Admin. Rules 416-470-0020(1).

100.

OYA staff are required to document a Major Behavior Violation in a Youth Incident Report (YIR). Or Admin. Rules 416-470-0030(1). The incident report must include the specific behavior committed, any unusual youth behavior, any witnesses, any physical evidence, any immediate action taken by staff including physical intervention, and any staff or youth injury. Or. Admin. Rules 416-470-0030(3).

101.

Following the YIR, the sanction, or Refocus Option is then imposed on the youth.

102.

On information and belief, when OYA staff has concluded a youth has committed a Major Behavior Violation, such as an assault with serious injury, that youth is punished with isolation along with their Safety Program sanction.

103.

A YIR for a Major Behavior Violation must be reviewed by the superintendent, camp director or a designee who was not involved in the incident. Or Admin. Rules 416-470-0040(1)-(2). "The reviewer may investigate or cause an investigation of the related incident if, in the reviewer's opinion, the Refocus Option appears excessive or inappropriate, or to clarify reported facts." Or Admin. Rules 416-4780-0040(3).

**Lack of Due Process**

104.

A youth's liberty interest is significantly impaired by isolation and placement in the IU.

105.

MacLaren places youth into isolation in response to their behavior as either an explicit or implicit form of punishment.

106.

Explicitly, a youth is punished with isolation when it is a component of a Refocus Option. There is no notice provided to the youth as to the allegations that will result in a Refocus Option sanction, nor is there adequate process for a youth to dispute those reasons in a Refocus Option.

107.

Youth are frequently placed into isolation at MacLaren beyond what the law permits. Because these placements into isolation cannot be justified under the safety requirements of the applicable law and administrative regulations, such a placement is punishment. Placements into isolation that are longer in duration than necessary are also forms of punishment that MacLaren inflicts on youth.

108.

Placing a juvenile into isolation for any amount of time that is not necessary for safety is inherently punitive.

109.

Even if the use of the IU at MacLaren is completely nonpunitive, it is a substantial infringement on the liberty of a youth that removes them from their housing unit, excludes them from school, interrupts their treatment and can impact the timing of their parole from the custody of the OYA.

110.

On information and belief, an adjudicated youth needs to have at least six to nine months without a YIR to be considered for parole.

111.

MacLaren does not provide due process for youth placed into isolation. A youth does not receive notice of the reason Maclaren seeks to place them in isolation. Nor do they receive explicit notice as to why they have been placed into isolation. There is no opportunity for a hearing, either before or after a youth's placement, to contest the allegations and determinations that resulted in an IU placement. As state law and policy require that isolation be extremely time-limited, there is no notice of the length of detention in isolation nor a hearing or process for a youth to present reasons why their placement in IU is excessively long or no longer needed.

112.

There is no documentation or findings provided to youth concerning the reasons for the placement nor its duration. As far as youth are informed, their detention in IU is indefinite.

113.

A youth does not receive documentation of OYA's decision to place the youth in isolation nor does the youth receive any written administrative review.

114.

OYA does have a grievance process that would, purportedly, permit a youth to administratively grieve his/her placement in isolation. The OYA grievance process is inadequate due process.

115.

There is no meaningful way for youth to submit a timely grievance that would result in any practical effect. Youth in isolation are not permitted writing implements or paper in their

isolation cells. Eventually, youth may be able to write a grievance after they are let out into the day room of the IU. However, youth do not receive written notice of what behavior has resulted in their IU placement. Youth likewise do not receive a notice of the lawful limitations of the use of isolation.

116.

Separately, OYA has a lengthy backlog of unanswered complaints and grievances. There are, at the time of the original complaint, approximately 3,000 grievances over the past 7 years that have gone unresolved.

117.

OYA's grievance process permits someone other than the youth to submit a grievance on their behalf. If someone other than a youth submits a grievance on the youth's behalf, but the youth does not authorize, in writing, OYA to share confidential information with the person whom submitted the grievance, then the grievance will not be responded to. This is true if the submitting person is the youth's attorney.

118.

OYA does not resolve grievances within a time period that would have a meaningful effect on the youth's detention in isolation.

**Plaintiff A.H.'s December 14, 2023 IU Safety Program with Isolation Placement (32 days)**

119.

Between December 14, 2023 and January 15, 2024, A.H. was placed in the IU for 32 days. This placement was intended to punish him for an alleged assault that he denied involvement in, but was afforded no meaningful process to contest the allegation. A.H.'s duration in IU was also unnecessary and inconsistent with the purported reason he was placed

there.

120.

On or about December 5, 2023, Group Life Coordinator Alondra Sierra authored Incident Summary report number 388993. This report concluded that, in the Dunes Unit, a youth was lured into the flats by two youth and "it was reported that" three other youth, including A.H., assaulted the victim.

121.

Two days after the assault on December 5, 2023, on or about December 7, 2023, A.H.'s Parole Officer, Eduardo Hernandez, questioned A.H. about the assault. A.H. responded he was in the flats when the assault occurred but denied involvement. A.H. told Hernandez he was irritated that MacLaren staff were trying to send him to IU without any evidence he was involved in the incident.

122.

On or about December 13, 2023, MacLaren staff Defendants Vargas and Bailey conducted an investigation that included surveillance camera review.

123.

There is no security footage of the assault because there are no security cameras in the flats.

124.

On December 14, 2023, A.H. was attending school at MacLaren. A.H. was not acting in any way that was threatening to himself or others. While there, he was detained by MacLaren security staff. A.H. was handcuffed and transported to the IU.

125.

Upon arrival to the IU, A.H. was instructed by DOE #3 to remove all of his clothing. After doing so, he was instructed to bend his knees, squat, and cough.

126.

A.H. remained in the IU for 32 days.

127.

The purpose of A.H.'s detention in the IU for 32 days was to punish him for his alleged conduct and in retaliation for the same.

128.

On information and belief, A.H. submitted a grievance regarding his unwarranted and unlawful placement into the IU. OYA did not respond to A.H.'s grievance.

129.

A.H. was not the only youth placed into isolation for this same alleged assault during this same period. A different youth subjected to the same punishment over the same allegation submitted a grievance contesting his detention in IU in a timely fashion. On information and belief, OYA did not respond to his grievance for approximately one year.

130.

The isolation cell that A.H. was placed into was dirty and smelled of urine and feces. A.H. was not provided an opportunity to clean the cell.

131.

At the time he was placed in isolation, on December 14, 2023, A.H. presented no physical safety threat to any other person or himself. At least 8 days had passed since the purported assault and A.H. was not accused of or suspected of any ongoing violence.

132.

On or about December 10, 2023, Defendant DOE #1 filed a Request for Youth Transfer to place A.H. on a Community Safety Protocol (Safety Program). The reason for the request is listed as "Assaultive Behavior" towards Peers and Staff.

133.

MacLaren staff, Defendant DOE #2, verbally informed A.H. his detention in IU was due to an assault of another youth in custody. A.H. denied involvement to staff and asserted factual innocence. DOE #2 informed A.H. that he was being placed in IU on a Safety Program because they believed he was involved in the assault.

134.

A.H. was not provided any form of a hearing or process to assert his innocence in the assault nor his placement into IU on the Safety Program.

135.

On December 14, 2023, Defendant Muro documented that the expectation for the Safety Program was that "[A.H.] will be working with CC and QMHP to meet goals and be safety integrated back to unit." Defendant Muro further documented the treatment plan's expectation that A.H. "will be meeting with CC or SDC for 1.5 hours a day for treatment, treatment will be focused on accountability, community safety and healthy skill development. [A.H.] must take part in the programming in order to transition back to unit."

136.

Defendant Muro's report did not state why the treatment plan could not be completed in Dunes.

137.

On December 14, 2023, A.H. was afforded a phone call, a shower, and time in core.

138.

During this detention in IU, A.H. spent the vast majority of the day in a single room alone. A.H.'s education and treatment program were interrupted. Youth placed in IU are not provided anything except for chalk to write on the walls and one or two books. During A.H.'s detention in IU, he experienced the same restrictions. He was also not permitted routine phone calls with family or contact with other youths.

139.

During this detention in IU, there were several days where A.H. and was not afforded an opportunity out of his IU cell for recreation, treatment, education, sanitation or a shower.

140.

Despite the Safety Program expectation that A.H. receive and participate in 1.5 hours of daily treatment, A.H. was provided with only one 1.5-hour treatment session. The remaining treatment sessions were 60 minutes or less.

141.

Despite the Safety Program expectation that A.H. receive daily treatment sessions, between December 14, 2023 and January 11, 2024, there are only 7 documented periods of A.H. being removed from his Isolation cell to work with staff toward his treatment-related goal:

- On December 19, 2023, MacLaren staff documented that A.H. was "working with staff."
- On December 21, 2023, Defendant Muro documented that A.H. spent 90 minutes out his room working with staff identified as "CC."
- On December 22, 2023, Defendant Muro documented that A.H. spent 60 minutes out his room working with staff identified as "CC" on Anger Management treatment.
- On December 23, 2023, Defendant Muro documented that A.H. spent 60 minutes out

his room working on Anger Management treatment with staff identified as "CC."

- On December 26, 2023, Defendant Laib documented that A.H. spent 60 minutes out of his room and was given a worksheet entitled "Life's Not Fair" to work on.
- On December 29, 2023, Defendant Segar documented that A.H. spent 60 minutes out of his room working on treatment.
- On January 9, 2023, Defendant Laib documented that "I checked in with [A.H.] today and gave him some treatment work about a Plan for Change. [A.H.] said that his PD told him he would be going back this week but will be on a sleep program for a bit."
- On January 11, 2024, Defendant Segar documented that "[A.H.] has completed all the treatment work that was given to him and is doing a great job on his [Safety Program]. [A.H.] has taken full accountability of his actions. Moving Forward we will bring [A.H.] Back to unit on Monday."

142.

Following completion of treatment work on January 11, 2024, Defendant Segar determined that it was necessary that A.H. be held in isolation for 4 more days before being returning him back to Dunes living unit. The 4 days was intended to be used to "go over the basic unit expectation and his [Individual Sleep Program] expectation" and to develop short- and long-term goals.

143.

On January 12, 2024, Defendant Segar released A.H. from his isolation cell approximately three hours to discuss unit expectations and to develop short- and long-term goals. A.H. remained in isolation and did not return to Dunes living unit until January 15, 2024.

144.

Between December 14, 2023 and January 15, 2024, A.H. was not provided with daily

opportunities for recreation.

145.

Between December 14, 2023 and January 15, 2024, there are only 2 documented periods of being removed from his Isolation cell to participate in organized recreation with other youth:

- On December 30, 2023, Defendant Segar documented that A.H. was provided 3.5 hours of recreation with peers and reported that “Over all [sic] the guys did a great job and it was successful.”
- On January 7, 2023, IU staff documented that A.H. was provided 1 hour of recreation with another peer and reported that “[t]heir interaction with each other was positive.”

146.

On January 15, 2024, A.H. was released from Isolation to return to Dunes living unit.

147.

The solitary confinement-like conditions of the IU, in addition to the uncertainty of its duration, injured A.H. and resulted in a degradation of A.H.’s mental health and emotional well-being.

148.

On February 9, 2024, Defendant Bigelow reviewed the December 5, 2023 YIR. A.H. is unaware of any other management review. The purpose of the review, as required by Or Admin. Rules 416-4780-0040(3), was to provide an opportunity for an investigation into the related incident, whether the Refocus Option appears excessive or inappropriate, or to clarify reported facts. There is no explanation in OYA policy or procedure or otherwise any documentation as to why Defendant Bigelow waited until after A.H. had completed his Refocus Option to review the facts of the incident and whether the Refocus Option was excessive.

149.

Between December 14, 2023 and January 15, 2024, MacLaren staff documented daily on the behavior of A.H..

150.

Between December 14, 2023 and January 15, 2024, MacLaren staff did not document any instance of misbehavior, emotional dysregulation, or threat of violence displayed by A.H..

151.

Between December 14, 2023 and January 15, 2024, MacLaren QMHP staff reported daily on the behavior of A.H. using words and phrases such as: "Coherent, stable. Regulated and appropriately engaged," "behaviorally stable," and "focused and respectful." QMHP staff documented repeatedly that, regarding A.H., "[IU] staff report no concerns."

152.

There is no explanation in OYA policy or procedure or otherwise documented why A.H.'s Safety Program required 32 days to complete, nor why the seven sessions could not have been completed within the maximum five days of isolation provided by OYA policy.

153.

This use of isolation, in conjunction with the Safety Program, did not comply with OYA's Isolation policy.

154.

On information and belief, the Defendant Berger did not review or approve the continuation of A.H.'s isolation beyond three consecutive days.

155.

On information and belief, the Defendant Berger did not submit written approval and supporting rationale of the use of Isolation beyond three consecutive days to the Facility Services

Director, Defendant McLellan.

156.

On information and belief, the Defendant Berger did not conduct weekly reviews of A.H.'s Safety Program, to determine whether he was able to self-manage and return to his living unit.

157.

On information and belief, the Defendant McLellan did not review or approve the continuation of A.H.'s isolation beyond five consecutive days.

158.

On information and belief, the Defendant McLellan did not conduct daily reviews or approve the continuation of A.H.'s isolation beyond five consecutive days.

159.

A.H., through counsel, submitted a grievance for his unwarranted and unlawful placement into IU from December 2023-January 2024.

160.

In response to the grievance, Defendant Bailey stated that A.H. had not been placed in isolation but that "[h]e instead participated in a safety program intervention during December 2023 and January 2024 in accordance with Or Admin. Rules 416-490-0033 after he seriously assaulted a peer on December 5, 2024 [sic]."

161.

In response to a secondary review request filed by A.H. through counsel, Defendant Britting confirmed that A.H. "did participate in a safety program intervention during December 2023 and January 2024, in accordance with [Or. Admin. Rules] 416-490-0033[]" and that the safety program was initiated "because [A.H.] participated in a significant incident that resulted in

serious bodily harm of a peer and had a significant negative impact in his living community." Defendant Britting further stated that "[t]he program was time-limited and focused on developing [A.H.'s] emotion regulation and problem-solving skills."

162.

In response to the final review request filed by A.H. through counsel, Defendant O'Leary confirmed that A.H. was placed on a Safety Program Intervention but acknowledged that "[my] office did identify aspect of OYA staff's practices that may not have aligned with OYA's policies related to [A.H.'s] placement on the Community Safety Protocol intervention."

**Plaintiff A.H.'s June 30, 2024 Isolation Placement (3 days)**

163.

On or about June 30, 2024, there was an altercation, not involving A.H., in or near the patio area of the Dunes unit. A.H. was instructed not to enter the patio area and a MacLaren staff person, Gabriella Martinez, physically blocked the door.

164.

A.H. pushed past Martinez and entered the patio area. In doing so, A.H. made physical contact with Martinez.

165.

MacLaren security staff restrained A.H. and removed him from the patio. A.H. returned to the day room of Dunes where he was alone for several minutes. By the time security staff re-approached A.H., A.H. had been alone for several minutes and did not engage in any similar aggressive conduct and was not behaving in any threatening manner.

166.

Security staff then placed A.H. in handcuffs and transported him to IU. Upon arrival at IU, A.H. was instructed by DOE #4 to strip all clothing until naked, squat down, and cough.

167.

A.H. was not afforded any hearing or process either before or after being placed in IU.

168.

Because OYA asserts it does not use IU as a punitive sanction, it does not provide a hearings process. The youth does not know how long they will remain in solitary confinement-like conditions. A.H. was not informed how long his detention in IU would last.

169.

In addition to the uncertainty of its duration, IU injured A.H. and resulted in a degradation of A.H.'s mental health and emotional well-being.

170.

In IU, A.H. was again placed in a single room, alone, where he remained for three days. He was only let out of his individual isolation cell for a short daily shower and for one recreation period that lasted approximately one hour.

171.

On July 1, 2024, Defendant Jacobo met with A.H. to inform him of his status regarding IU placement and informed A.H. that he would return later in the day with more information. Defendant Jacobo also documented that the conversation with A.H. was productive.

172.

During A.H.'s detention in the IU, a Qualified Mental Health Provider checked the condition of the A.H. once on June 30, 2024, twice on July 1, 2024, and twice on July 2, 2024. A.H. was not noted to be behaving in any way that would justify continued detention in the IU.

173.

On or about July 2, 2024, A.H. was released from isolation and the IU and told to apologize to Ms. Martinez. He did so. Prior to his return to Dunes, A.H. was again instructed to strip nude and instructed to squat and cough by DOE #5.

174.

A.H. could have taken all of the corrective action asked of him, with respect to Ms. Martinez, of him within hours of the incident and calmly returned to the Dunes unit.

175.

A.H.'s detention in the IU for three days was to punish him for his conduct and in retaliation for the same.

176.

A.H., through counsel, submitted a grievance for his unwarranted and unlawful placement into IU from June-July of 2024.

177.

In response to the grievance, Defendants Bailey and Britting stated that A.H. had been placed in Isolation in accordance with OYA policy "because violence occurred." Defendants Bailey and Britting also state that A.H. was "seen by" mental health staff four times during this Isolation period. In response to the final review request filed by A.H. through counsel, Defendant O'Leary confirmed that A.H. was placed in Isolation and acknowledged that "[my] office did identify some aspects of OYA staff's response that did not align with OYA's policies related to [A.H.'s] reintegration planning."

**Plaintiff E.E.'s September 2, 2024 IU Safety Program with Isolation Placement (23 days)**

178.

Between September 2, 2024 and September 25, 2024 E.E. was placed in isolation in IU. This placement was intended to punish him for failing to follow directives and for verbally threatening behavior towards staff. E.E.'s duration in IU was also unnecessary and inconsistent with the purported reason he was placed there.

179.

On or about September 2, 2024, Defendant Jacobo authored Incident Summary report number 393808. This report summarized that, in the Dunes Unit, E.E. participated in a group disturbance where youth partially filled a laundry cart with water and barricaded themselves in the unit flats and refused directives to leave the flats. The report further alleged that during this period E.E. threw magnets at windows causing them to shatter. Staff gained control of the situation and all youth involved in the incident were informed that they were going to be taken to IU. Jacobo reported that "[E.E.] wrapped his durag around his right fist and was preparing to go into a physical altercation with staff. [E.E.] was adamant that he would not go to IU willingly, that staff would have to fight him." Staff successfully de-escalated the situation by putting E.E.'s mother on speaker phone who convinced him to cooperate with staff directives and "E.E. cooperated with staff and was taken to IU."

180.

E.E. asserted that he was not an active participant in the group disturbance and that he had only been using the bathroom at the time. E.E. gave OYA staff the name of a witness who would corroborate his statement, but staff ignored this information. OYA staff informed E.E. that the evidence of his active involvement in the group disturbance was broken glass.

181.

The Incident Summary Report documents that E.E. was placed in IU for an "Incident Safety Placement" only from 6:35 PM on September 2, 2024 to 9:00 AM on September 7, 2024 for a total duration of 110.4 hours.

182.

E.E. was strip-searched by OYA staff upon entering IU. E.E. was instructed to remove all clothing, squat, and cough.

183.

E.E. was in IU from September 2, 2024 until September 26, 2024.

184.

E.E. was in IU pending approval for a Safety Program from September 2, 2024 until September 10, 2024.

185.

E.E. was approved to begin a Safety Program on or about September 10, 2024.

186.

E.E. was released from IU and the Safety Program on or about September 26, 2024.

187.

E.E. did not receive any procedural due process prior to this placement in IU for the Safety Program.

188.

E.E.'s placement and duration in IU was inconsistent with OYA policy.

189.

During this period in IU, E.E. requested a book and was given a dictionary. E.E. was not given a pen or paper to write with in his cell so he kept track of the days in his head. E.E. made repeated requests to call his mother and was told by IU staff that they would let him know later.

190.

During this period in IU, E.E.'s isolation cell was filthy and smelled of urine, infested with ants, the walls were covered in graffiti and blood stains, and the toilet was rusty with had layers of built up grime.

191.

The extended periods of isolation and social deprivation caused harm to E.E. by feeling like his head was being "messed with" and he began talking to himself a lot.

192.

E.E. was behaviorally stable within hours of his placement into IU and his stability and emotional regulation was well documented.

193.

On September 3, 2024, OYA Staff Roderick Edwards reported "Connected with [E.E.] while in IU. He was in good spirits. I questioned why he was placed in IU. For this incident he reported being in the wrong place at the wrong time and he didn't know what his peers had planned. I also asked him about a YIR written a couple days ago as well. He took ownership of his actions during that time and quoted it being a "stupid choice" I let [E.E.] know that he can't dig his way out a whole by digging out the bottom of it. He understood the message."

194.

On September 4, 2024, QMPH Legg documented: "Met with youth per IU review. [E.E.] had questions as to whether or not he had been referred to [Community Safety Program]. He reported that he got worked up in the moment, but that there would be not further conflict if he had returned to unit. No reported concerns. * * * Observed as behaviorally stable."

195.

On September 5, 2024, Jacobo documented that "I informed him that he had been

referred for a [Community Safety Program] and that we would know if he was approved for in the next few days."

196.

On September 9, 2024, Jacobo documented that he "at approximately 1300 hours, I went to IU (Intervention Unit) and checked in with [E.E.]. I asked him how he was doing and if he needed anything. [E.E.] asked about his CSP (community safety plan). I informed him that it was still being reveiwed [sic] and we would have an answer today."

197.

On September 10, 2024, Jacobo documented that he provided E.E. with a phone call to his mother and informed E.E. that a Community Safety Program would be developed on September 11, 2024.

198.

On September 11, 2024, Jacobo documented that "at approximately 1730 hours, I stopped by IU and checked in with [E.E.]. I asked how he was doing and if he needed anything. [E.E.] reported he was good."

199.

On September 13, 2024, Defendant Muro documented that "[E.E.] took part in required activities and when [sic] over his CSP program, [E.E.] is working on patients [sic]."

200.

On September 14, 2024, an OYA staff documented "[E.E.] took part in a group discussion regarding the bathroom incident that had occurred the previous day. [E.E.] was receptive to the conversation, he did well at respectfully expressing his view and engaging in a healthy group discussion."

201.

On September 17, 2024, OYA staff Anthony Wong documented that "[E.E.] came out of his room for about 8 hours, he participated a morning circle group of restorative justice discussion, he was sharing that he was a 8 out of 10, and looking forward to complete his CSP program and requirements and going back to unit in few weeks. [E.E.] was in high energy and like to work out and did pushups and setups. He completed his daily education assignments as well as FP5 homework. Afternoon [E.E.] played basketball with his peers in SITP gym for 2 hours, spending the rest of his day in Hawks Den watching TV show, and checking in with LUM and CC regarding his progress of his CSP expectation. There was no behavioral issues to report."

202.

On September 18, 2024, Muro documented that "[E.E.] worked with sdc on treatment today. We focused on Values, completing a values worksheet. He worked well with his peers in a group discussion about values, [E.E.] identified TRUST as a value for him sharing, memories as to why TRUST is a value for him."

203.

On September 19, 2024, an OYA staff documented that "[E.E.] had a good day overall participating in CSP programming. Youth had positive interactions between his peers and staff. Youth engaged in his treatment work and protective time watching the TV series 'The Flash' with his peers. There are no negative behaviors to report from today's programming."

204.

On September 20, 2024, OYA Staff Jordan Nordlein documented that "[E.E.] had a good day participating in CSP programming. Youth was supervised in Hawk's Den for most of the day. Youth participated in restorative justice community circle with the topic being how he was feeling on a scale of 1-10 and why also where he would live in the world if he had the choice and

why. Youth had positive interactions with his peers and staff, no negative behaviors to report. Youth is showing patience and resilience this week it gets closer to him going back to unit."

205.

On September 2, 2024, E.E. was placed in isolation in IU at approximately 6:35 PM.

206.

On September 3, 2024, E.E. spent approximately 22 hours in isolation.

207.

On September 4, 2024, E.E. spent approximately 22 hours in isolation.

208.

On September 5, 2024, E.E. spent approximately 21.75 hours in isolation.

209.

On September 6, 2024, E.E. spent approximately 21.25 hours in isolation.

210.

On September 7, 2024, E.E. spent approximately 23.75 hours in isolation.

211.

On September 8, 2024, E.E. spent approximately 23.25 hours in isolation.

212.

On September 9, 2024, E.E. spent approximately 22 hours in isolation.

213.

On September 10, 2024, E.E. spent approximately 20.5 hours in isolation.

214.

On September 11, 2024, E.E. spent approximately 20.25 hours in isolation.

215.

On September 12, 2024, E.E. spent approximately 15.5 hours in isolation.

216.

On September 13, 2024, E.E. spent approximately 16 hours in isolation.

217.

On September 14, 2024, E.E. spent approximately 14 hours in isolation.

218.

On September 15, 2024, E.E. spent approximately 20.25 hours in isolation.

219.

On September 16, 2024, E.E. spent approximately 16 hours in isolation.

220.

On September 17, 2024, E.E. spent approximately 16 hours in isolation.

221.

On September 18, 2024, E.E. spent approximately 15.75 hours in isolation.

222.

On September 19, 2024, E.E. spent approximately 16.75 hours in isolation.

223.

On September 20, 2024, E.E. spent approximately 15.5 hours in isolation.

224.

On September 21, 2024, E.E. spent approximately 15 hours in isolation.

225.

On September 22, 2024, E.E. spent approximately 17 hours in isolation.

226.

On September 23, 2024, E.E. spent approximately 20 hours in isolation.

227.

On September 24, 2024, E.E. spent approximately 16 hours in isolation.

228.

On September 25, 2024, E.E. spent approximately 17 hours in isolation.

229.

On October 10, 2024, Defendant Britting reviewed the Incident Summary Report.

230.

On February 28, 2025 E.E. submitted a grievance and did not receive a response to the grievance until on March 17, 2025.

231.

On March 21, 2025 E.E. submitted a grievance review to Defendant Britting and did not receive a response to the grievance review until on April 18, 2025.

232.

On April 28, 2025 E.E. submitted a final grievance review to Defendant McLellan and did not receive a response to the final grievance review until on May 28, 2025.

233.

Korey Ramsay, Britting and McLellan responded to E.E.'s grievance for the September 2024 IU placement and stated that E.E. was in IU for approximately 23 days and participated in a safety program intervention from September 7, 2024 to September 25, 2024 in response to the group disturbance, and acknowledged that some aspects of the placement were not in accordance with OYA procedure. Ramsay, Britting, and McLellan failed to acknowledge the full period that E.E. was in IU from September 2, 2024, and did not assert that the IU placement was necessary because violence had actually occurred.

**Plaintiff E.E.'s November 24, 2024 IU Safety Program with Isolation Placement (13 days)**

234.

On or about November 24, 2024, E.E. was involved in a fight with another youth in custody at MacLaren.

235.

For this conduct, between November 24, 2024 and December 5, 2024 E.E. was placed in the IU for 13 days. This placement was intended to punish him for a mutual fight with another youth. E.E.'s duration in IU was unnecessary and inconsistent with the purported reason he was placed there.

236.

E.E. was strip-searched by OYA staff upon entering IU in the same manner as his isolation placement in September of 2024.

237.

E.E. was emotionally regulated and not an imminent threat to any other person within hours of his placement into the IU.

238.

E.E. was initially told by an OYA staff that he would only be spending the night in IU in response to the mutual fight, but he was instead referred for a Safety Program the following day.

239.

E.E. requested medical attention for his hand which was injured in the fight, but his request was ignored.

240.

Of that time, E.E. remained in his locked cell for 23 hours per day in isolation for approximately 6 days awaiting an approval for a Safety Program.

241.

During this period in IU, E.E. would only recreate with and spend free time in core with the youth that he fought with.

242.

The Safety Program treatment consisted of a packet and accountability letters that E.E. completed within 4 days.

243.

After completing the Safety Program treatment, E.E. requested to be returned to his regular housing unit, but was instead provided with an additional treatment packet.

244.

It was unnecessary for E.E. to remain in IU to complete the treatment requirement because E.E. was not emotionally dysregulated and could have completed the treatment requirements while on his regular housing unit.

245.

During this period in IU, E.E.'s isolation cell was filthy and smelled of urine, infested with ants, the walls were covered in graffiti and blood stains, and the toilet was rusty with had layers of built up grime.

246.

E.E. did not receive any procedural due process prior to his placement this placement in IU for the Safety Program.

247.

On February 28, 2025 E.E. submitted a grievance and did not receive a response to the grievance until on March 17, 2025.

248.

On March 21, 2025 E.E. submitted a grievance review to Defendant Britting and did not receive a response to the grievance review until on April 18, 2025.

249.

On April 28, 2025 E.E. submitted a final grievance review to Defendant McLellan and did not receive a response to the final grievance review until on May 28, 2025.

250.

Korey Ramsay, Britting and McLellan responded to E.E.'s grievance for the November 2024 IU placement and stated that E.E. was in IU for approximately 13 days and participated in a safety program intervention from November 24, 2024 to December 5, 2024 in response to a mutual fight and stated that the IU placement was in accordance with OYA procedure.

**Plaintiff E.E.'s Strip Search**

251.

During the calendar year of 2024, E.E. was forcibly strip-searched by an OYA staff member in the presence of a female staff member Angelica Hernandez-Fragua.

252.

On February 28, 2025 E.E. submitted a grievance and did not receive a response to the grievance until on March 17, 2025.

253.

On March 21, 2025 E.E. submitted a grievance review to Defendant Britting and did not receive a response to the grievance review until on April 18, 2025.

254.

On April 28, 2025 E.E. submitted a final grievance review to Defendant McLellan and did not receive a response to the final grievance review until on May 28, 2025.

255.

Korey Ramsay, Britting and McLellan responded to E.E.'s grievance for a forcible strip search in front of a female staff person that he alleged occurred during the November 2024 IU placement and denied the allegation as unfounded. Both Britting and McLellan ignored requests provide E.E.'s attorney with a copy of documentation from the investigation conducted by the Professional Standards Office related to this allegation.

**Plaintiff E.E.'s April 2025 IU Placement**

256.

In April, 2025, E.E. was placed in IU and housed in the Geer compound. Although a different building, Rockaway, was being used at that time as the new location for the IU, that building was at capacity.

257.

Prior to placement in the IU in April of 2025, E.E. was not afforded a hearing or any other due process.

258.

For the first four days, E.E. was restricted to his IU cell for 23 hours a day.

259.

The conditions of the IU cells were unsanitary and the same as they were during his September 2024 and November 2024 IU placements.

**Anti-Rehabilitative Environment and Inhumane Conditions**

260.

Plaintiff A.H.'s 32-day Safety Program treatment did not follow the Safety Program plan, and the few treatment sessions provided were untimely, sporadic and limited in duration.

261.

Plaintiff E.E.'s 24-day Safety Program treatment did not follow the Safety Program plan, and the few treatment sessions provided were untimely, sporadic and limited in duration.

262.

During the Safety Program treatment, Plaintiffs were not afforded writing implements in his Isolation cell and was therefore unable to work on written material while locked in the Isolation cell. This severely limited Plaintiffs' ability to independently progress on treatment related issues for at least 23 hours out of the day. As such, Plaintiffs' removal from isolation was reliant exclusively on when OYA staff would allow A.H. out of his isolation cell and facilitate treatment sessions.

263.

During both placements in IU, A.H. was subjected to inhumane and unconstitutional conditions, including but not limited to: being denied daily showers; being denied daily recreation; being confined in a filthy cell that smelled like urine and feces, and with no sanitation provided; receiving no educational opportunities; social deprivation; and receiving minimal and sporadic treatment opportunities.

264.

During both placements in IU, E.E. was subjected to inhumane and unconstitutional conditions, including but not limited to: being confined in a filthy cell that smelled like urine and feces, and with no sanitation provided; receiving minimal and sporadic educational opportunities; social deprivation; and receiving minimal and sporadic treatment opportunities.

265.

The inconsistent treatment, anti-rehabilitative environment and inhumane conditions of Plaintiffs' confinement in IU caused Plaintiffs significant emotional, psychological, and physical distress.

**Supervisory Liability**

266.

Defendant O'Leary was the Director of OYA at the time of both IU placements. Under Or. Rev. Stat. § 420A.015, he was responsible for the performance of the duties, functions, and powers of the youth authority. He was also authorized to organize the OYA as necessary to properly conduct OYA's mandate. Or. Rev. Stat. § 420A.020 commands that the director is responsible for appointing all subordinate officers and employees of the OYA and prescribing their duties. Under Or. Rev. Stat. § 420A.025, the director is also tasked with adopting "rules necessary for the administration of the laws that the Oregon Youth Authority is charged with administering." The Director of OYA is ultimately responsible for implementing training to ensure compliance with law, ensuring that training is effective, and intervening when becoming aware that any training is not effective.

267.

At all times relevant, Defendant McLellan was the Facility Services Assistant Director. Under OYA Policy II-B-1.2, she is responsible for approving, in writing, any use of isolation beyond 5 days. If continued isolation is approved, the Facility Services Assistant Director must notify the director, subsequently review the isolation intervention daily for appropriateness, and document the daily review. The Facility Services Assistant Director is responsible for the implementation of OYA policies, supervision of OYA staff, and training of OYA staff. The Facility Services Assistant Director is provided with a regular report on the use of isolation at all

OYA facilities.

268.

Between on or about March 13, 2025 and on or about August 17, 2025 Defendant McLellan was the Interim Director of OYA and assumed all the duties of Director.

269.

Defendant Berger was the Superintendent of MacLaren at the time of both of Plaintiffs' IU placements. Under policy II-B-1.2, Defendant Berger is responsible for reviewing, and then approving or denying, the continuation of a youth in isolation beyond three consecutive days. This review and its results must be documented. If a youth has not been returned to the youth's living unit within five consecutive days, the superintendent must submit a written approval request with supporting rationale to the Facility Services Director. The Superintendent is also responsible for a weekly review of any Safety Program placement and as part of that review must determine whether the youth is able to self-manage behavior and return to their living unit.

270.

Defendants O'Leary, McLellan, and Berger were all provided regular reports on the use of isolation at all OYA facilities and had access to OYA's record keeping system that would document, or fail to document, the specific reasons for the use of isolation on a particular youth.

271.

Defendants O'Leary, McLellan and Berger knew or should have known that isolation causes mental and emotional harm to adolescents.

272.

Defendants O'Leary, McLellan and Berger have failed to investigate reports of abuse of isolation, failed to properly train staff on the lawful use of isolation, and failed to institute or properly implement policies that would protect youth from misuse of isolation from staff.

273.

Defendants Tessean, O'Leary, McLellan, Berger and Tessean are responsible for ensuring OYA's compliance with constitutional standards, state law, and for enacting and enforcing OYA policies to implement those legal standards.

274.

OYA has adopted policies that define appropriate usage of and limits duration of isolation. Defendants Tessean's, O'Leary's, McLellan's and Berger's failures to properly train staff, to institute or properly implement those policies, and to investigate reports of staff abusing the use of isolation, had the effect of nullifying those policies and their intended protections.

275.

Defendants Tessean, O'Leary, Berger, McClellan and Tessean were and are aware that the use of isolation at MacLaren fell outside of its policy and statutory mandates. On information and belief, administrative staff repeatedly attempted to train staff to restrict the use of isolation to the circumstances where it is legally permissible.

276.

Defendants Tessean, O'Leary, Berger, and McClellan were and are aware that isolation was used outside of its legal and policy limits and in violation of youths' constitutional rights. Defendants O'Leary, Berger, and McClellan deliberately failed to intervene and stop this practice, and to ensure proper training of subordinates.

## CLASS ACTION ALLEGATIONS (Fed. R. Civ. P. 23)

277.

Plaintiffs bring this action pursuant to FRCP 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated

individuals. Plaintiffs propose two classes that satisfy the requirements of FRCP 23(a)-(b).

278.

The first class ("Injunctive Relief Class") consists of all youth currently in the custody of OYA, or who will be in the future held in OYA custody, and who are subjected to placement in the Intervention Unit (IU) for longer than 4 hours. The class period extends to the date that OYA is enjoined from, or otherwise ceases, enforcing their unconstitutional policy, practice, and custom of placing youth in custody to periods of isolation.

279.

The second class ("Damages Class") consists of those youth who were or are in custody of the OYA and subjected to placement in the IU for longer than 4 hours in any one period of time. The class period for the Damages Class commences on June 6, 2023.

280.

**Numerosity:** The class is so numerous that joinder of all members is impracticable. Upon information and belief, OYA confines approximately 370 youth and has approximately 500 youth on parole or probation that may be subject to confinement, and the challenged practices apply to all. OYA, at times, at MacLaren, places so many youth into isolation at one time that the isolation unit exceeds its capacity and a secondary building must be used to house additional youth in isolation.

281.

Joinder of the Injunctive Relief Class is impracticable because: (1) the class members are numerous; (2) the class is fluid because it includes future members who will be youth held in OYA close custody facilities, current class members who will leave OYA close custody facilities

during the class period, and class members who will enter OYA close custody facilities during the class period; (3) the class members are incarcerated, making their abilities to institute individual lawsuits limited; and (4) the class supports judicial economy.

282.

Joinder of the Damages Class is impracticable because: (1) the class members are numerous; (2) the class is fluid because it includes future members who will be placed in IU during the pendency of this action; (3) the class members are incarcerated, making their abilities to institute individual lawsuits limited; (4) the class will be too numerous to practically join because OYA's policy intentionally did not provide due process to every single youth it placed into solitary confinement; and (4) the class supports judicial economy.

283.

**Commonality:** Common questions of law and fact exist with respect to both classes including whether Defendants' use of the "Safety Program" constitutes punitive solitary confinement, whether it violates state policy, and whether it deprives youth of procedural and substantive due process rights and Eighth Amendment protections. For the Damages Class, Defendants, intentionally, and by design, deprive all OYA youth of any procedural Due Process protections with respect to the use of IU, and that denial of constitutional rights is common to all class members. The harms and injuries that Plaintiffs E.E. and A.H. have suffered are a result of uniform policies that OYA and MacLaren apply to every youth placed in isolation. Additionally, it is well documented and generally agreed upon by juvenile psychological professionals that the use of solitary confinement on youth causes known and foreseeable harm for nearly any youth placed in isolation. For the Injunctive Relief Class, whether Defendants policy and practices with respect to the use of isolation, and whether those practices violate the classes' constitutional rights, will apply to all class members equally.

284.

**Typicality:** Plaintiffs' claims are typical of the claims of the class because they arise from the same conduct and policy and the harms Plaintiffs have suffered, as a result of Defendants' conduct, are typical of the harms and injuries suffered by the class members.

285.

**Adequacy:** Plaintiffs will fairly and adequately represent the interests of the class. Plaintiffs have no interests adverse to the class. Plaintiffs' Counsel is competent and experienced in civil rights litigation and the Oregon juvenile justice system.

286.

Plaintiffs seek both injunctive and class relief. As such, prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Further, any injunction requiring Defendants to address their constitutional violations would prevent other litigants from seeking a different injunction. Plaintiffs seek class certification under Fed. R. Civ. P. 23(b)(1).

287.

This action, in part, seeks injunctive and declaratory relief. As a result, in addition to certification under FRCP 23(b)(1), Plaintiffs also seek certification under FRCP 23(b)(2). All proposed class members were subjected the same lack of due process, violation of their constitutional rights, and suffered the same harm and injury. Defendants have been notified of their unconstitutional conduct and have continued to fail to correct it. In short, Defendants have both acted and refused to act on grounds generally applicable to all class members so that final injunctive relief and declaratory relief is appropriate respecting the class as a whole.

288.

Plaintiffs also seek certification under FRCP 23(b)(3) because the questions of law or fact common to class members predominate over any questions affecting only individual class members. The Plaintiffs allegations of violations of their constitutional rights are a result of the Defendants' policy and practice in how they administer and impose solitary confinement upon youth in custody. Use of a class action would fairly and efficiently adjudicate the controversy.

289.

Upon information and belief, there are at least 370 youth in OYA close custody and approximately 500 on parole or probation who are members of the proposed class.

290.

In the alternative, Plaintiffs also seek partial certification under Fed. R. Civ. P. 23(c)(4).

**First Claim for Relief:**
**(Procedural Due Process – Violation of 5th & 14th Amendments, U.S. Const.)**
**(Against All Defendants)**

291.

Plaintiffs re-allege all prior paragraphs and incorporates those allegations herein by this reference.

292.

All Defendants were acting under color of state law.

293.

Plaintiffs have a liberty interest under Or. Rev. Stat. § 420A.108(1)(b)(C) in not being placed in isolation as a sanction or punishment for violations of rules regulating the conduct of youth in the custody of OYA.

294.

Plaintiffs have a liberty interest under OAR 416-490-0032 in not remaining in isolation beyond the minimum time-period required for him to recover self-control.

295.

Plaintiffs have a liberty interest in not being confined in isolation in contradiction to the applicable Oregon Revised Statutes, Oregon Administrative Rules, and OYA Policy.

296.

Plaintiffs have a liberty interest in not being subjected to harm and injury.

297.

Plaintiffs had a liberty interest in not being subjected to IU because it imposed an atypical and significant hardship, as described above.

298.

Defendants denied Plaintiffs notice, a hearing, an opportunity to he heard, or meaningful review before subjecting him to periods of isolation in the IU as a sanction or punishment for alleged violations of rules regulating the conduct of youth in the custody of OYA.

299.

Defendants did not provide due process when they subjected Plaintiffs to isolation prior to being placed in the IU either as part of a Safety Program or otherwise.

300.

Defendants' failure to comply with OYA's policy and rules while Plaintiffs were in IU violated due process.

301.

Defendants' failure to provide Plaintiffs adequate due process to challenge his confinement, or continued confinement, in IU violated due process.

302.

As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs suffered significant harm, including emotional distress, anxiety, and psychological trauma.

303.

Individually and collectively, Defendants' wrongful actions, described above, involved reckless or callous indifference to the federally protected rights of Plaintiffs.

304.

Defendants have violated Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution.

**Second Claim for Relief:**
**(Substantive Due Process and Cruel and Unusual – Violation of 14th and 8th Amendments, U.S. Const.)**
**(Against All Defendants)**

305.

Plaintiffs re-alleges all prior paragraphs and incorporates those allegations herein by this reference.

306.

All Defendants were acting under color of state law.

307.

The Fourteenth Amendment of the United States Constitution protects the substantive due process rights of the Plaintiffs.

308.

At all times relevant, Plaintiffs were not prisoners who had been convicted of a crime. Instead, A.H. and E.E. were adjudicated youth who were committed to the OYA for rehabilitation and treatment.

309.

Defendants' use of the Intervention Unit at MacLaren against Plaintiffs amounts to punishment and violates the Fourteenth Amendment.

310.

Isolation was punishment for, and in response to, Plaintiffs' alleged misconduct.

311.

The Safety Program was a punishment for, and in response to, Plaintiffs' alleged misconduct.

312.

Defendants' failure to comply with mandatory statutes, policies, and rules by subjecting Plaintiffs to isolation was arbitrary and irrational.

313.

Defendants' response to Plaintiffs' alleged conduct of placing the individual Plaintiffs in isolation, and maintaining his placement in isolation, in both cases, was excessive and exaggerated in relation to the purpose of emotional regulation, self-control and rehabilitation.

314.

Defendants knew, and deliberately disregarded, the fact that isolation is harmful to Plaintiffs.

315.

As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs suffered significant harm, including emotional distress, anxiety, and psychological trauma.

316.

Individually and collectively, Defendants' wrongful actions, described above, involved reckless or callous indifference to the federally protected rights of Plaintiffs.

317.

Defendants have violated Plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

**Third Claim for Relief:**
**(State Tort - Negligence)**
**(Against All Defendants)**

318.

Plaintiffs re-allege all prior paragraphs and incorporates those allegations herein by this reference.

319.

All Defendants were acting within the scope of their employment and under color of state law.

320.

Defendants O'Leary's, McLellan, and Berger conduct fell below the standard of care of a reasonable and prudent person acting under the same or similar circumstances in the same or similar community as follows:

a. In failing to enforce or implement proper oversight of the use of isolation;

b. In failing to conduct appropriate reviews of the known or reasonably suspected mis-use of isolation;
c. In failing to ensure that MacLaren staff strictly adhere to the proper use of isolation;
d. In failing to establish procedures to ensure adequate due process that would avoid the unnecessary and unlawful use of isolation.

321.

Each of the failures above created a foreseeable risk of harm to all youth at MacLaren including Plaintiffs.

322.

Given the risk of harm to youth at MacLaren, Defendants' failures were unreasonable.

323.

Each of the failures described above was a cause of the Plaintiffs' mental and emotional injury; loss of opportunity to engage in treatment and education to which he was entitled; loss of his civil rights to be free from unreasonable and degrading strip searches; and loss of his civil rights to be free from cruel and unusual punishment and due process of law.

324.

Each of the steps that Defendants failed to take should have been taken specifically to prevent the known risk of staff mis-using isolation against Plaintiffs.

325.

Plaintiffs are entitled to damages.

**Fourth Claim for Relief:**
**Use of Strip Search Violates the Fourth and Fourteenth Amendments**
**(Against Defendants DOE #3, DOE #4, and DOE #5)**

326.

Plaintiffs re-allege all prior paragraphs and incorporate those allegations herein by this reference.

327.

OYA has a policy on the search of a YIC upon placement into the IU. That policy directs that only a frisk search is to be conducted unless there is "probable cause to believe that such search will lead to the discovery of contraband that may be used to harm the youth or others or is a threat to the safety and security of the facility." In addition, such a search must be approved by a manager.

328.

There was not probable cause to believe that the strip searches Plaintiffs were subjected to would lead to the discovery of contraband that may be used to harm himself or pose a threat to safety and security.

329.

On information and belief, no manager approved the strip searches of Plaintiffs when he was placed into the IU or returned.

330.

Strip searching the Plaintiffs upon admission into IU or release from IU, as described, constitutes punishment and was excessive and exaggerated in relation to the purpose and reasons of Plaintiffs' IU placement.

331.

Defendants DOE #3-#5 know or should know that subjecting Plaintiffs to strip searches is humiliating, intimidating, degrading, and harmful to youth.

332.

Defendants DOE #3-#5 subjected Plaintiffs to unreasonable strip searches without individualized suspicion and in violation of OYA policy.

333.

Through their use of strip searches, Defendants DOE #3-#5 have subjected Plaintiffs to unreasonable searches or seizures, in violation of the Fourth Amendment.

334.

By exposing youth to humiliating, degrading, excessive, and harmful strip-searches, Defendants DOE #3-#5 violated Plaintiffs' rights under the Fourteenth Amendment.

335.

Defendants DOE #3-#5 acted or failed to act and are continuing to act or fail to act under color of state law.

336.

Individually and collectively, Defendants DOE #3-#5 wrongful actions, described above, involved reckless or callous indifference to the federally protected rights of Plaintiffs.

337.

Plaintiffs are entitled to damages and injunctive relief.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray that this Court will enter a Judgment in their favor, and against Defendants, as follows:

A. Grant declaratory judgment, declaring that:

1. Defendants violated Plaintiffs' rights under the Fifth, Eighth and Fourteenth Amendments;

B. Grant relief, ordering Defendants and their agents and employees, to immediately:

1. Implement policies ensuring compliance with lawful and constitutional isolation limits, sanitation standards, and due process protections;

2. Affirm that injunctive relief apply to all members of the Injunctive Relief Class;

C. Grant Plaintiffs nominal damages against each Defendant, jointly and separately, in their individual capacities, for their violation of Plaintiffs' constitutional rights, as alleged herein; and to grant nominal damages for all member of the Damages Class

D. Grant Plaintiffs compensatory damages in an amount to be determined at trial against each Defendant, jointly and separately, in their individual capacities, for their violation of Plaintiffs' constitutional rights and tortious conduct, as alleged herein; and to grant compensatory damages for all members of the Damages Class

E. Grant Plaintiffs punitive damages in an amount to be determined at trial, against each Defendant, jointly and separately, in their individual capacities for their willful, deliberate and intentional violation of Plaintiffs' constitutional rights by:

1. Knowingly and willfully acting, and refusing to act, in violation of the Fifth, Eighth and Fourteenth Amendments; and

2. Grant punitive damages to the Damages Class;

F. Certify this case as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2);

G. Appoint Plaintiffs as class representatives and counsel as class counsel;

H. Award Plaintiffs reasonable costs, expenses and attorney fees, pursuant to 42 U.S.C. § 1988.

I. Grant Plaintiffs such further relief as this Court deems just and equitable under the circumstances.

**Pursuant to 28 U.S.C. § 1746(2), I hereby verify and declare under penalty of perjury that the foregoing is true and correct.**

DATED this 2nd day of February, 2026.

Respectfully submitted,

*s/ Thaddeus Betz*_______________
Thaddeus Betz
Attorney for Plaintiffs